**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BRIAN JABLONSKI | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No: 26-00449 (JMC) |
| | * | |
| KASHYAP P. PATEL et al. | * | |
| | * | |
| Defendants. | * | |

* * * * * * * * * * * *

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Brian Jablonski ("Mr. Jablonski") faithfully dedicated nearly 20 years of his life as an employee of the United States Government, all of which was in the service of the Defendant Federal Bureau of Investigation ("Defendant FBI"). On February 1, 2026, he was unlawfully fired by the FBI's Director Defendant Kashyap Patel ("Defendant Director Patel") under the guise of the President's Article II authority. But Defendant Director Patel has no constitutional, statutory or regulatory authority under Article II to take such action, nor can he factually or legally identify any delegation by the President for him to act as a surrogate and terminate Mr. Jablonski.

The question of Defendant Director Patel's Article II authority is the starting point of the current dispute before the Court, and it should be viewed as the ending point of the first stage of this litigation. None of the other issues that are raised by the Defendants' Motion to Dismiss need to be addressed at this time and can be denied without prejudice as moot. Because Defendant Director Patel lacked legal authority to terminate Mr. Jablonski, that personnel action must be deemed null and void as a matter of law. He must be immediately reinstated and provided with appropriate backpay (as well as reconciliation of his leave and retirement credit

and other personnel modifications that would apply to his change in status). Whether the Defendants can then properly and lawfully terminate him pursuant to applicable FBI regulations and policies, and consistent with all the due process protections that are supposed to be afforded an FBI employee, will be left to another day to litigate.

## FACTUAL AND PROCEDURAL BACKGROUND

As is well settled, at the motion to dismiss stage the factual allegations in Mr. Jablonski's Complaint are taken as true. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). But given this filing also serves to support a Cross-Motion for Partial Summary Judgment on the second (5th Amendment), third (*Ultra Vires* In Violation Of Statutory Authority), fourth (APA), fifth (Declaratory Judgment) and sixth (Mandamus) causes of action, Mr. Jablonski will therefore set forth the relevant facts for consideration on those counts only. *See* Statement of Material Facts Not in Dispute at 1-3 (dated July 20, 2026).

Mr. Jablonski started working for the Defendant FBI in 2008 as a Police Officer, after working two years for the Transportation Security Administration as an officer. In June 2019, he transitioned into a Management and Program Analyst role at the FBI, which was a GS-13, step 3 and the position he held at the time of his termination. As an analyst he supported multiple FBI projects, contracts, and critical systems, and the FBI's background investigation system. He was not supervised by any principal officers within Defendant FBI or Department of Justice. Declaration of Brian Jablonski at ¶3 (dated July 19, 2026)("Jablonski Decl."), attached at Exhibit "1"; Complaint, 1-2, ¶4 (Dkt. 1)(filed February 12, 2026).

On Thursday, January 29, 2026, Mr. Jablonski was called into a meeting with FBI security and told he was being placed on ten-day paid administrative leave. It was stated that he was not in any trouble at the time, but they were reviewing some online activity that had been

reported. They did not specify what the nature of the online activity was or what platform it might have been. Jablonski Decl. at ¶4; Complaint, ¶8.

Three days later, on Monday, February 2, 2026, Mr. Jablonski reported to FBI headquarters to turn in his laptop based on instructions he had received. Upon arrival, he was informed there would be a meeting to discuss his situation, but he was not told in advance what the meeting would be about. He was taken to a conference room where he was provided a one-page letter signed personally by Defendant Director Patel and informed him of his termination. Jablonski Decl. at ¶5; Complaint, ¶9.

The memo was dated Friday, January 30, 2026, the day after he was told he was being placed on administrative leave. The memo reads, in relevant part, as follows:

> This document provides official notice that you are being summarily dismissed from your position at the Federal Bureau of Investigation, and removed from the federal service, under my authority as the FBI Director, effective immediately.
>
> You have demonstrated unprofessional conduct, and pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Federal Bureau of Investigation is hereby terminated.

Jablonski Decl., Exhibit "1-A"; Complaint, ¶9.

Mr. Jablonski asked the FBI official who provided him with this memo if he would be provided any evidence of wrongdoing. He was simply told there was no further information available. Jablonski Decl. at ¶8; Complaint, ¶10. At this time, Mr. Jablonski remains usure of what he did to deserve to be summarily terminated, other than being told his administrative leave was based on unidentified online activity. In fact, Mr. Jablonski did not then, nor does he now, have a significant social media presence online. He has a very basic public LinkedIn profile and a Facebook account set at high privacy protections, i.e., only those individuals he was "friends" with could review his postings/comments. Jablonski Decl. at ¶9; Complaint, ¶11.

Since January 20, 2025, Mr. Jablonski is not the only FBI employee who has been terminated by Defendant Director Patel via an Article II memorandum. Dozens of similar terminations have occurred. Declaration of Mark S. Zaid, Esq. at ¶6 (dated July 19, 2026)("Zaid Decl."), attached at Exhibit "2"). Some of these have also resulted in litigation. *Id*. at ¶¶4-5. In an attempt to undermine legal challenges brought by some of these terminated employees, months after being terminated the Attorney General of the United States issued a new memorandum that purports to ratify and affirm Defendant Director Patel's action. *Id*. at ¶7; Exhibit "2-A". Mr. Jablonski never received any such follow-up memorandum from the Attorney General. Jablonski Decl. at ¶10; Zaid Decl. at ¶7.

This lawsuit was filed by Mr. Jablonski on February 12, 2026. Dkt. 1. The Defendants filed a Motion to Dismiss on June 22, 2026. Dkt. 8.

## **<u>ARGUMENT</u>**

The Defendants hope to frame this lawsuit in a manner that pre-January 20, 2025, would have likely resulted in a court ruling that dismissed his claims because he is, as a non-preference FBI employee, prohibited under the Civil Service Reform Act ("CSRA") from bringing a challenge of his termination to the Merit System Protection Board ("MSPB"). *See* Memorandum in Support of Defendant's Motion to Dismiss at 4-8 (filed June 22, 2026)(Dkt. 8)(Defs' Memo"). Though this issue of preclusion and the extent to which this Court can nonetheless exercise jurisdiction over Mr. Jablonski's constitutional claims are discussed herein, these are issues best left to be addressed, if ever at all, later in this litigation.

Instead, this Court should respectfully first address, and grant summary judgment for Mr. Jablonski on, the narrow question of whether an FBI Director possesses authority, whether constitutionally or statutorily, to summarily terminate employees under Article II. Should that

answer be – as a matter of law – in the negative, none of the other issues or arguments addressed by the Defendants are ripe for adjudication and their Motion to Dismiss should be denied without prejudice as moot.

But even if this Court were to determine Defendant Director Patel did possess Article II authority, it still retains jurisdiction because the CSRA scheme does not touch upon Article II terminations. Moreover, this Court also can similarly exercise jurisdiction over Mr. Jablonski's constitutional claims notwithstanding the application of the CSRA, as some of its sister courts have so held. With that in mind, the Defendants' Motion to Dismiss should be respectfully denied as well.

## I. LEGAL STANDARDS OF REVIEW

### A. Summary Judgment

Pursuant to Federal Rules of Civil Procedure Rule 56, summary judgment should be awarded to a movant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the appropriateness of summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006), accepting the non-moving party's evidence as true, and draw "all justifiable inferences" in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment should only be awarded to a movant if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if a dispute over it might affect the outcome of a suit under governing

law; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination. *Anderson*, 477 U.S. at 248. An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

**B. Fed. Rule Civ. Procedure 12(b)(1)**

When a defendant brings a motion under Fed. R. Civ. P. 12(b)(1), this presents a "threshold challenge" to the court's jurisdiction. *Metro. Washington Chapter v. District of Columbia*, 57 F. Supp. 3d 1, 13 (D.D.C. 2014). A plaintiff can overcome this by "establishing jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011)(*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Rann v. Chao,* 154 F. Supp. 2d 61, 64 (D.D.C. 2001). The Court, in its analysis, "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

**C. Fed. Rule Civ. Procedure 12(b)(6)**

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Such a motion should only be granted if it appears beyond doubt that a plaintiff will be unable to prove any set of facts that support his claim entitling him to relief. *See Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 188 (D.D.C. 2007)(*citing Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991)). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(cleaned up). Moreover, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017)(*citing Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)(*quoting Schuler v. United States*, 617 F. 2d 605, 608 (D.C. Cir. 1979)); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)(court must also give plaintiff "benefit of all inferences that can be derived from the facts alleged."). Taken as true, a complaint's factual allegations need only rise above the speculative *level. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570).

## II. THE FBI DIRECTOR DOES NOT POSSESS ARTICLE II AUTHORITY TO SUMMARILY DISMISS EMPLOYEES AND MR. JABLONSKI IS ENTITLED TO SUMMARY JUDGMENT ON THIS ISSUE

As a matter of law, the Defendant Director Patel does not possess authority, whether constitutionally or statutorily, to terminate Mr. Jablonski without cause or due process. Therefore, his termination was unlawful on its face and must be deemed null and void.

### A. Mr. Jablonski Is Neither A Superior Or Inferior Officer And Is Clearly An Employee Who Cannot Be Summarily Terminated Under Article II Authority

The President's removal authority is principally grounded in the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. For purposes of that clause, "federal workers fall into three categories:

(i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court of law; and (iii) non-officer employees, whose appointments are unaddressed (and thus unconstrained) by the Clause." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1096 (D.C. Cir. 2021).

The Defendants do not address this issue in their attempt to dismiss Mr. Jablonski's Complaint. The category Mr. Jablonski falls into, however, is a relevant issue for this Court and merits discussion. An officer is "inferior" rather than "principal" "if her work is directed and supervised at some level by principal officers," such as the Attorney General and others who report directly to the President. *Fleming*, 987 F.3d at 1103 (citation omitted); *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). An "officer" exercises "significant authority pursuant to" federal law, whereas a mere "employee . . . does not." *Id*. at 759 (citation omitted). The Supreme Court deferred whether removal authority extends to "lesser functionaries subordinate to officers of the United States." *Id. citing Free Enterprise Fund v. Pub. Co. Acct. Oversight Board*, 561 U.S. 477, 513-14 (2010).

To begin, there can be no factual or legal dispute that Mr. Jablonski is a "non-officer" employee. He was a GS-13, step 3, and was not supervised at any level by a principal officer. Jablonski Decl. at ¶3. *See* The Test for Determining 'Officer' Status Under the Appointments Clause, 2025 WL 293746, at *13 (O.L.C. Jan. 16, 2025)("[F]ederal law enforcement agents and line attorneys who assist superior officials in conducting litigation on behalf of the federal government need not be appointed consistent with the Appointments Clause . . . . The authority exercised by these individuals is not sufficiently significant for Appointments Clause purposes because of the ways in which their discretion is constrained and because it is the superior

officials, not the line employees assisting them, in whom the powers are vested.”). Precedent suggests that not even the President can effectuate his summary removal pursuant to Article II, but given those are not the facts or issue here that question can be left for another dispute. Nonetheless, for proper context and background, it may still be helpful to analyze the overall concept of Article II authority, including that of the President.

Presidential power to remove executive officers is incidental to the power to appoint. *Myers v. United States*, 272 U.S. 52, 119 (1926); *Braidwood Mgmt., Inc*., 606 U.S. at 763. When the President appoints an officer, the President ordinarily retains authority to remove that officer. *Myers,* 272 U.S. at 119. But Article II draws a critical distinction when appointment authority does not reside with the President. The Constitution expressly authorizes Congress to vest the appointment of inferior officers “by Law” in the “President alone, in the Courts of Law, or in the Heads of Departments.” U.S. Const. art. II, § 2. When Congress exercises that authority and vests appointment power in a department head — as it has done here — the Constitution permits Congress to define the conditions under which those officers may be removed. The Supreme Court settled this rule nearly 150 years ago in *United States v. Perkins*, 116 U.S. 483, 485 (1886).

In *Perkins*, the Court stated there is “no doubt that when [C]ongress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest.” On that basis, it upheld a statute providing that an inferior officer appointed by the Secretary of the Navy could be dismissed only pursuant to court-martial. *Id*. Congress’s ability was solidified to “limit and restrict the power of removal” of “inferior officers” appointed by heads of agencies “as [Congress] deems best for the public interest.” *Id*. The Supreme Court explained that Congress’s authority flows from the

Appointments Clause, under which "Congress may by Law vest the Appointment of . . . inferior Officers, as they think proper, . . . in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The Constitution's grant of "authority" to Congress to "vest" appointment also "implies authority to limit, restrict, and regulate . . . removal." *Perkins*, 116 U.S. at 485; *see also Myers*, 272 U.S. at 161 (same).

A century later, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court confirmed that where "Congress ha[s] chosen to vest the appointment of 'inferior' executive officials in the head of a department," there is no "specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." *Id*. at 689 n.27 (citation omitted). The Court upheld the constitutionality of a statute providing "good-cause tenure protection" to an "independent counsel appointed to investigate and prosecute particular alleged crimes by highranking Government officials" — an "inferior officer" the Court described as "[having] limited jurisdiction and tenure" and lacking policymaking or significant administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020)(*quoting Morrison*, 487 U.S. at 691).

Notably, Justice Scalia — an ardent advocate of the Article II removal power — agreed in *Morrison* that the President lacks "plenary power to remove inferior officers." 487 U.S. at 724 n.4 (Scalia, J., dissenting). He explained that the President "retains control over the executive branch" when inferior officers are "removable for cause" because "cause" includes "the failure to accept supervision," and inferior officers' politically accountable superiors — principal officers — are removable at will. *Id*. Thus, although Article II "generally" grants the President expansive authority to remove executive officers, *Seila Law*, 591 U.S. at 213, the Supreme Court

has repeatedly "left in place" the exception for inferior officers as recognized in *Perkins* and *Morrison*. *Id*. at 215, 217 (emphasis omitted).[1]

Based on this case law, it would be more than reasonable to conclude Congress may also regulate the removal of lower-level civil servants, such as Mr. Jablonski, who do not rise to the level of "inferior officers." *See, e.g., Free Enterprise Fund*, 561 U.S. at 507 (striking down "novel" dual layer of removal protections for officers but emphasizing "[n]othing in our opinion . . . should be read to cast doubt on the use of . . . the civil service system"); *Fleming*, 987 F.3d at 1096 (nonofficer employees are "unaddressed (and thus unconstrained)" by Appointments Clause). *See also Lucia v. SEC*, 585 U.S. 237, 245-51 (2018)(analyzing differences between officers and employees).

None of the arguments above were directly addressed, much less contradicted, by the Supreme Court's recent decision in *Trump v. Slaughter*, 2026 U.S. LEXIS 2877, *18 (U.S. June 29, 2026), which dealt with the termination of Superior Officers serving as Commissioners on the Federal Trade Commission. The Court made it very clear that only the narrow question of the President's Article II authority to terminate superior officers was addressed. *See e.g. id*., at *44 ("Nor do we determine the fate of officials not before us."). While the Supreme Court made it expressly clear that *Slaughter*, 2026 U.S. LEXIS 2877, *10, overruled whatever was left of *Humphrey's Executor v. United States*, 295 U. S. 602 (1935), there is no indication that it modified the rulings in *Perkins*, *Morrison*, *Free Enterprise*, or *Seila Law*, all of which Mr.

[1] Whatever the reasoning that led to the creation of this exception, this Court must follow *Perkins* and *Morrison* unless and until the Supreme Court overrules them. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). The Court's most recent decision in *Slaughter* which explicitly addressed the President's Article II authority, as noted herein, definitely did not. Thus, *Perkins* and *Morrison* remain good law.

Jablonski relies upon. Indeed, the majority did not even mention *Perkins* at all. *See Slaughter*, 2026 U.S. LEXIS 2877, *103 (Sotomayor, J., dissenting)(highlighting majority ignored *Perkins*).

Thus, given Mr. Jablonski, as a non-officer employee, could not be terminated under Article II by the President, he most certainly could not be terminated under that same authority by Defendant Director Patel.[2]

**B. The Attorney General's Ratification And Affirmation Of Certain FBI Article II Terminations By Defendant Director Patel Concedes A Lack Of Authority**

Beyond the strength standing alone of Mr. Jablonski's argument that Defendant Director Patel lacks Article II authority, it would appear the Defendants themselves have concerns, although the evidence for this premise was not addressed by their Motion. As some of the FBI Article II lawsuits gained steam, notably *Driscoll* and *Jane Does #1-9*, the Defendants took an

[2] There are several similar challenges working their way through the Courts right now in multiple jurisdictions that address the Article II authority over inferior officers or employees by either the President or his subordinates. Most of these cases are awaiting rulings, other than as noted below. *See e.g. Comans v. Executive Office of the President et al.*, Civil Action No. 25-1237-MSN-WE (E.D.V.A.)(memorandum terminating Federal Emergency Management Agency official "at the direction of the President"); *Driscoll et. al. v. Patel et al.*, Civil Action No. 25-3109 (D.D.C.)(JMC)(termination of FBI senior officials by Director); *Jane Does #1-9, et. al. v. Patel et al*. Civil Action No. 25-4258 (D.D.C.)(TNM)(termination of numerous FBI personnel by Director); *Pearson v. Patel et. al*. Civil Action No. 26-00509 (D.D.C.)(termination of FBI analyst by Director); *John Doe #1 et al. v. Patel et al.*, Civil Action No. 26-0959 (D.D.C.)(JMC)(termination of FBI employees by Director); *Comey v. Department of Justice et al.*, Civil Action No. 25-7625 (S.D.N.Y.)(JMF)(termination of federal prosecutor by Attorney General); *Gordon v. EOP*, Civil Action No. 25-2409 (D.D.C.)(JMC)(termination of three Department of Justice employees by Attorney General); *Schnitt v. Bondi*, Civil Action No. 25-4111 (D.D.C.)(CRC)(termination of DOJ employee by Attorney General). Both *Comans* and *Comey* issued rulings that directly support Mr. Jablonski's argument that the CSRA does not serve as an obstacle to this Court accepting jurisdiction, as discussed *infra* in Section III. On July 17, 2026, the Court in *Comans* (in which the undersigned also serves as counsel) issued a verbal ruling from the Bench that Article II authority did not permit the termination of an inferior officer without due process and granted summary judgment to the Plaintiff. Politico, "Judge rules FEMA CFO's firing was illegal," July 17, 2026, at *https://www.politico.com/news/2026/07/17/ trump-fema-firing?fbclid=IwY2xjawTIzAVleHRuA2FlbQIxMQBzcnRjBmFwc F9pZBAyMjIwMzkxNzg4MjAwODkyAAEeX6089L0vMaJoAOC1s1EsiN_5i12Qo0HwLpX4zUBm w3boMyEbHx9ALcxoLAs_aem_KWxXX44vYLONqWsxs3Pj1w*. The forthcoming written decision will no doubt be analyzed further in subsequent filings in this case.

extraordinary step that reflects a recognition of the weakness, if not outright concession, that their argument that Defendant Director Patel possesses Article II authority must fail. By Memorandum dated February 5, 2026, and which was filed on the public record in both *Driscoll* and *Jane Does #1-9*, the Attorney General expressly ratified and affirmed Defendant Director Patel's termination decisions for those individuals. Exhibit 2-A; *See Driscoll*, Dkt. 31-1 (filed March 6, 2026); *Jane Does #1-9*, Dkt. 14-2 (filed February 6, 2026). Presumably, this was an attempt to undermine the viability of Plaintiffs' legal argument that Defendant Director Patel lacked such authority and instead place the decision in the hands of the Attorney General as the Department head and someone directly responsive to the President. Otherwise, if the Defendants' arguments in this case are correct, why else take this upward step? Notably, Mr. Jablonski has never been notified that the Attorney General has similarly ratified or affirmed his termination. Jablonski Decl. at ¶10; Zaid Decl. at ¶7.

1. *Department of Justice Precedent Supports Mr. Jablonski's Argument That Defendant Director Patel Could Not Have Been Delegated Any Article II Authority*

In fact, this Court need only look to the Department of Justice, the parent component of Defendant FBI, for the conclusion that Article II removal authority cannot be delegated to officials beneath Department heads (hence why the Attorney General intervened as described above). The Office of Legal Counsel issued an opinion not even seven years ago that addressed this very issue:

> We have long advised, for instance, that the President alone may appoint officers by and with the advice and consent of the Senate. *See* Military Appointments, 29 Op. O.L.C. at 134–35. Congress may authorize the President to delegate to department heads the authority to appoint inferior officers who do not require Senate confirmation, because the Appointments Clause allows Congress to give that authority to department heads. See id.; Delegation of the President's Power to Appoint Members of the National Ocean Research Leadership Council, 21 Op. O.L.C. 38, 39 (1997). But the President's constitutionally assigned authority to

> appoint officers subject to the Senate's advice and consent is not delegable. *See* Military Appointments, 29 Op. O.L.C. at 134–35.

Appointment & Removal of Fed. Reserve. Bank Members of the Fed. Open Mkt. Comm., 43 Op. O.L.C. 263, 281 (2019), 2019 WL 11594453, at *12-13 & n.8, at *https://www.justice.gov/olc/file/1349721/dl*. The legal opinion importantly continued to state:

> Those same principles of political accountability apply to the power of a department head to remove inferior officers. When it comes to the supervision of an officer within the Executive Branch, the removal power is perhaps even more significant than the appointment authority. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." (internal quotation marks omitted)). Accordingly, we have advised that the *authority to remove inferior officers may not be delegated to an agency official other than the department head, or another official constitutionally competent to appoint that officer in the first place.* Although, unlike the power to appoint officers, the power of removal is not expressly enumerated in the Constitution, that power is frequently treated as a necessary correlate to the power to appoint. For example, we have long maintained that the President's power to remove officials appointed by and with the advice and consent of the Senate cannot be assigned to another official just as his appointment power may not be.

43 Op. O.L.C. at 282 (emphasis added). "We have conceived of both the power to appoint and the power to remove such officers as being among the nondelegable authorities 'prescribed by the Constitution.' *Id*. at 283, *citing* Centralizing Border Control Policy Under the Supervision of the Attorney General, 26 Op. O.L.C. 22, 24–25 (2002). If the President's removal power cannot be delegated to the FBI Director to remove inferior officers, then that authority most certainly cannot be delegated to terminate regular employees such as Mr. Jablonski either.

This Office of Legal Counsel pronouncement should be viewed as binding upon the Defendants and serve as a guide to this Court for a ruling in favor of Mr. Jablonski. That is how the Department of Justice views the situation. It recently argued to the MSPB in an Article II

case that OLC opinions are binding. *Jackler and Jaroch Consolidation v. DOJ et al.*, 2026 M.S.P.B. 3, at ¶12 (March 20, 2026).[3] *See also Dist. of Columbia v. Trump*, 315 F. Supp. 3d 875, 884 n.16 (D. Md. 2018)("[OLC] opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies.")(*quoting United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011)(Bea, J., concurring)); *but see Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 922 F.3d 480, 486 (D.C. Cir. 2019)(distinguishing where OLC opinions have not been adopted by individual agencies as the "working law" of the agency).

Unlike in some of the other cases, such as *Coman*, the President did not direct any communication to Mr. Jablonski as an FBI employee. Nor did Defendant Director Patel's Termination Letter state he was acting on behalf of the President. Instead, the termination decision was issued "under my authority as FBI Director." Complaint, ¶9; Jablonski Decl. at ¶7; Exhibit 1-A. Since Defendant Director Patel could not have been legally delegated Article II authority from the President, and the Attorney General has not ratified or affirmed the termination (which Mr. Jablonski does not concede would convey any level of legitimacy), Mr. Jablonski is entitled to summary judgment on this issue as a matter of law.[4]

---

[3] The Board in *Jackler* declined to resolve the question of whether the OLC Opinion was binding upon it, as it was able to resolve the dispute without doing so. *See id*., 2026 M.S.P.B., at ¶13

[4] Conceivably, the Defendants could argue that Defendant Director Patel could have simply summarily dismissed Mr. Jablonski in reliance on the FBI's own internal disciplinary policies, *see Langemen v. Garland*, 88 F.4th 289 (D.C. Cir. 2023)(discussed *infra* at Section IV(A)), and that whichever authority was relied upon is a distinction without a difference. That would be analogous to stating it was still appropriate to have executed an individual who was falsely convicted of a specific crime because it was also discovered they had committed some other crime for which they had not yet been prosecuted. Facts matter. The law matters. Defendant Director Patel specifically and solely stated he was using his "authority as the FBI Director … pursuant to Article II of the United States Constitution." Jablonski Decl., Exhibit "1-A". And while the termination memorandum also refers to the "laws of the United States", *id*., which is

(Continued…)

Therefore, Mr. Jablonski's termination should be held null and void and he is entitled to be reinstated back to the position he held before being unlawfully fired on January 29, 2026, receive appropriate backpay and all applicable benefits that arise therefrom. With Mr. Jablonski's termination rescinded, there is nothing left for this Court to adjudicate and the Defendants' Motion to Dismiss, which addresses the remaining claims that comprise Mr. Jablonski's Complaint, should respectfully be denied without prejudice as moot.

## III. ARTICLE II TERMINATIONS FALL OUTSIDE OF THE CSRA AND JURISDICTION REMAINS WITH THIS COURT

Even if Defendant Director Patel is recognized as possessing delegated Article II authority, this Court still possesses jurisdiction to hear Mr. Jablonski's claims and the Defendants' Motion to Dismiss should respectfully be denied.

The Defendants do not address the issue directly other than to argue the CSRA prevents two of his claims. Defs' Memo at 8-9. Their argument assumes this litigation is a garden variety claim brought pre-January 20, 2025, and the CSRA, which admittedly has a recognized carve-out for FBI employees such as Mr. Jablonski, applies in the first place. *See e.g.*, *Lamb v. Holder*, 82 F. Supp. 3d 416, 422 (D.D.C. 2015)(*citing* 5 U.S.C. § 7511(b)(8) and finding it "exclude[es] employees of the FBI from [the CSRA's] subchapter concerning removal"); Defs' Memo at 8-9.

---

(…Continued)
the same text apparently used in many, if not all, of the other FBI Article II terminations, at no time in any of these cases have the Defendants argued that "the laws of the United States" was a reference to the CSRA or contend that any of the individuals fired was "for such cause as will promote the efficiency of the service." *See Comey*, 2026 U.S. Dist. LEXIS 92589, *7 fn.8. As the 16th-century French proverb states "comme on faist son lict, on le treuve" (as one makes his bed, so he finds it).

Respectfully, when it comes to Article II summary terminations, it does not.[5]

The only two courts that are known to have addressed this specific issue post-January 20, 2025, ruled in favor of the terminated employee and against the government. *See Comans*, 2026 U.S. Dist. LEXIS 93532, *4-5 (Apr. 15, 2026, E.D.V.A.)("Plaintiff's due process claims are not channeled away from this Court. In fact, jurisdiction in federal district court, and not the MSPB, is mandatory."); *Comey*, 2026 U.S. Dist. LEXIS 92589, *2 (Apr. 28, 2026, S.D.N.Y.) ("the Court concludes that Comey's case does not fall within the purview of the CSRA's scheme because she was fired pursuant to Article II of the Constitution, not pursuant to the CSRA itself.").

In *Comans*, which involves the Article II termination of the former Chief Financial Officer of the Federal Emergency Management Agency (and who is represented by the undersigned), the Hon. Michael S. Nachmanoff noted "the threshold question is whether the agency order at issue falls within the relevant statutory review scheme". *Comans*, 2026 U.S. Dist. LEXIS 93532, *8 (*quoting Union Pac. R.R. v. U.S. R.R. Retirement Bd.*, 162 F. 4th 908, 914 (8th Cir. 2025)). *See Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 185 (2023)("a statutory review scheme . . . does not necessarily extend to every claim concerning agency action"); *Worthington v. United States*, 168 F. 3d 24, 26 (Fed. Cir. 1999)("The CSRA, by its terms, however, does not encompass every

---

[5] Before this current administration assumed power, summary terminations at the FBI were uncommon, though they could occur and were even seen to be increasing. In 2021, the Department of Justice's Office of the Inspector General published a report on Defendant FBI's misconduct investigations process and noted that for decades summary dismissal was reserved for "extraordinary cases 'where the safety of the public, our fellow employees, national security interests or other compelling considerations may be at stake.'" "Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations," 21-127, at 15 (2021), available at *https://oig.justice.gov/sites/default/files/reports/21-127.pdf* ("DOJ OIG ROI"); FAC, ¶29. Reliance on Article II authority was unheard of for any type of termination, which is why there is absolutely no mention of it in the DOJ OIG ROI. In fact, the undersigned signatory counsel has never encountered or had even heard of one in over thirty years of practice, which regularly involves Defendant FBI and its personnel, until 2025. Zaid Decl. at ¶6.

adverse personnel action against a federal employee."). "To determine the scope of the [CSRA's] special statutory review provisions, we look to the text of [the] statute[], taking into account 'both the specific context in which language is used and the broader context of the statute as a whole.'" *Union Pac. R.R.*, 162 F. 4th at 915.

Two weeks after Judge Nachmanoff ruled in *Comans*, the Hon. Jesse M. Furman issued his opinion in the *Comey* matter. Maureen Comey was a well-respected experienced Assistant U.S. Attorney in the Southern District of New York whose likely only "crime" was being the daughter of the former FBI Director James Comey. For that, she was terminated pursuant to Article II by the Attorney General. As with *Comans*, Judge Furman rejected the government's arguments and accepted jurisdiction because after "reviewing the text, structure, and purposes of the CSRA, the Court does not discern a congressional intent to channel challenges to such 'Article II removals' into the statutory review scheme." *Comey*, 2026 U.S. Dist. LEXIS 92589, *35. Notably, and consistent with the undersigned counsel's experience in handling federal disciplinary matters:

> Moreover, there is an apparent explanation for any gap between the Court's conclusion here and congressional purpose: As far as the Court can tell, when enacting the CSRA, Congress did not consider "Article II removals" of career civil servants because they were not a thing. The parties do not cite, and the Court has not found, any instance between the 1883 enactment of the Pendleton Civil Service Reform Act and the 1978 enactment of the CSRA in which the Executive Branch invoked standalone "Article II" authority to remove a career civil servant.

*Id*. at *21. *See also* Zaid Decl. at ¶6 (same).

To be sure, Mr. Jablonski, like most FBI employees, are precluded – absent two exceptions which are not relevant to this proceeding – from pursuing a challenge to the MSPB of an FBI removal decision because Defendant FBI is exempt from the competitive service. *See* 28 U.S.C. § 536. Even when Congress amended the CSRA in 1990 to expand its jurisdiction for some of the excepted services, it still limited the protections afforded under subchapter II of chapter 75

for FBI employees because of the "sensitive missions" of those employees. *Hamlett v. Dep't of Justice*, 90 M.S.P.R. 674 at ¶15 (MSPB, 2002). It was also likely known that the "FBI's internal process for imposing adverse actions parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties even though it is not required to offer those protections to most of its employees." DOJ OIG ROI at 2. Most importantly for this discussion, and notwithstanding the preclusion from MSPB review, "[t]he Constitution and other laws … continue to apply to the FBI even though it is an excepted service agency." *Id*. at 2-3.

Both the Plaintiffs in *Comans* and *Comey* actually had the ability and legal right to bring their termination challenges to the MSPB, and in fact both did even while pursuing the same claims before a federal district court. *Comans*, 2026 U.S. Dist. LEXIS 93532, *4-5; *Comey*, 2026 U.S. Dist. LEXIS 92589, *12. That both of these federal employees had MSPB rights does not end the comparison to Mr. Jablonski's circumstances even though he did not have similar rights. Indeed, it would seemingly make little sense for this anomaly to impact the analysis accorded in both *Comans* and *Comey* as to whether Article II terminations are in any way affected by the existence of the CSRA or not. "It follows that because the MSPB has no jurisdiction, this Court necessarily has federal question jurisdiction over Plaintiff's due process claims because of the 'serious constitutional question that would arise if [the CSRA] were construed to deny any judicial forum' for those here." *Comans*, 2026 U.S. Dist. LEXIS 93532, *14 (*citing Coleman v. Napolitano*, 65 F. Supp. 3d 99, 104-05 (D.D.C. 2014)(collecting cases)).

Therefore, although Mr. Jablonski is precluded by the CSRA from filing an appeal to the MSPB, he is not prohibited from pursuing his constitutional claims against the Defendants before this Court and should respectfully be permitted to proceed further.

## IV. THE CSRA DOES NOT BAR MR. JABLONSKI'S CONSTITUTIONAL CLAIMS

Additionally, this Court can still maintain jurisdiction over Mr. Jablonski's constitutional claims because even if termination decisions rendered pursuant to Article II do not fall outside of the CSRA's scope, nonetheless the statute does not preclude his ability to have these claims adjudicated before a federal district court.

The Supreme Court has made clear that "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them" and "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *superseded by statute on other grounds (quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–818 (1976)) and *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821). *See Slaughter* 2026 U.S. LEXIS 2877, *68 ("And our doctrines addressing Article III, the Due Process Clause, and the Seventh Amendment can help ensure that adjudications of private rights take place where they belong, before independent judges and juries.")(Gorsuch, J., concurring).

The CSRA codified a new framework for evaluating adverse personnel actions against federal employees. *See Lindahl v. OPM*, 470 U.S. 768, 773-74 (1985). There is no dispute that this statutory review scheme by way of the MSPB divested district courts of jurisdiction over many claims brought by federal employees, even certain constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10-14 (2012). Nor is there any dispute that Mr. Jablonski did not have MSPB rights. 5 U.S.C. § 7511(b)(8). But that is not the end of the debate. "[W]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)(internal citation omitted). In prior

cases where the Supreme Court held that the CSRA precludes the invocation of federal question jurisdiction in the district courts it pointed to "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," and that led to the conclusion that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11; *see also United States v. Fausto*, 484 U.S. 439, 443 (1988)(explaining CSRA "prescribes in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review"). In *Fausto*, the Court described "the primacy of the MSPB for administrative resolution of disputes over adverse personnel action." *Id*. at 449.

In fact, courts in our District have held that the CSRA does not preclude non-covered employees from bringing their constitutional claims. *See, e.g.*, *Jewell v. Jagadesan*, 2026 U.S. Dist. LEXIS 50609 *7-8 (D.D.C. Mar. 22, 2026)(*quoting Graham v. DOJ*, 2002 U.S. Dist. LEXIS 27419, 2002 WL 32511002, at *3 (D.D.C. Nov. 20, 2002)("Although the CSRA precludes plaintiff from bringing his APA claims, his constitutional challenges to the Bureau's actions stand on a different footing."), *aff'd in part sub nom. Graham v. Ashcroft*, 2003 U.S. App. LEXIS 16108 (D.C. Cir. Aug. 5, 2003)(per curiam), *and Graham v. Ashcroft*, 358 F.3d 931(D.C. Cir. 2004). *See also Lamb v. Holder*, 82 F. Supp. 3d at 422-24 (same, collecting cases); *id*. at 423 ("Court finds it has subject matter jurisdiction to hear these constitutional due process claims under the grant of federal question jurisdiction in 28 U.S.C. § 1331."). *See also Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 371 (D.D.C. 2020)("[B]oth because of and despite the fact non-covered government workers lack any CSRA remedy, judicial review of claims related to CSRA-covered actions brought by such employees, *other than claims for equitable relief for constitutional wrongs*, is also precluded." (emphasis added). Courts require a

"heightened showing" of Congressional intent before "construing [a statute] to deny any judicial forum for a colorable constitutional claim." *Elgin*, 567 U.S. at 9 (citation modified) (*quoting Webster v. Doe*, 486 U.S. 592, 603 (1988)).

In similar legal challenges, the Defendants have argued that these holdings cannot be reconciled with *Elgin* and *Fausto*. This is an understandable argument which is no doubt why Judge Nachmanoff directly addressed the issue in *Comans* in noting it did not trouble him because a "comparison to *Fausto* is inappropriate because the employees there brought a statutory, not constitutional, challenge." *Comans*, 2026 U.S. Dist. LEXIS 93532, *14 fn.3. Judge Furman similarly recognized the argument and rejected it: "The fact that Congress may not have even considered the possibility of Article II removals when enacting the CSRA also distinguishes this case from *Fausto*, upon which Defendants rely." *Comey*, 2026 U.S. Dist. LEXIS 92589, *22. *See* Defs' Memo at 4-8.

Constitutional claims are collateral to any review afforded by the CSRA and Article III courts may retain jurisdiction over employment claims of federal employees that raise constitutional challenges. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984)(retaining jurisdiction over allegation that officials responsible for reduction-in-force action held office in violation of Appointments Clause); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996)(retaining jurisdiction over employee's First Amendment claim).

This Court should respectfully avail itself of the jurisdictional opportunity to adjudicate Mr. Jablonski's constitutional claims.

### A. Mr. Jablonski Retains A Protected Property Interest In Receiving Due Process Before Being Terminated For Investigated Or Proven Misconduct

Defendants move to dismiss Mr. Jablonski's Second Cause of Action (procedural due process claim) on the basis that he lacks a protected property interest. Defs' Memo at 6-8.

Respectfully, the Defendants' Motion should be denied because Mr. Jablonski has adequately alleged a property interest in being afforded due process before his FBI employment could be terminated based on the "overall workings" of the FBI's disciplinary system, which conditions dismissal on work-related reasons.

For the most part, the law governing this Cause of Action is not in dispute. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest … Only after finding the deprivation of a protected interest do [courts] look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). "For a property interest to be constitutionally protected by procedural due process, a person must 'have a legitimate claim of entitlement to it.'" *Langeman v. Garland*, 88 F.4th 289, 295 (D.C. Cir. 2023)(*quoting Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "A procedural due process violation under the Fifth Amendment occurs when a government official deprives a person of property without appropriate procedural protections." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020). Under *Perry v. Sindermann*, 408 U.S. 593 (1972), it "denotes a broad range of interests that are secured by 'existing rules or understandings,'" including where "mutually explicit understandings [] support a claim of entitlement to the benefit." *Id*. at 601 (*quoting Roth*, 408 U.S. at 577). The key inquiry is whether a plaintiff had a "legitimate expectation" to the benefit in question. *See Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).

In public employment, a property interest arises when the government gives an employee "assurances of continued employment or conditions dismissal only for specific reasons." *Stone v. F.D.I.C.*, 179 F.3d 1368, 1374 (Fed. Cir. 1999). Such rights may stem from statutes or regulations. But they may also arise if the agency has "fostered rules and understandings [that

entitle the employee] to believe that he would lose his job only for a job-related reason." *Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979).[6]

Of course, Mr. Jablonski never sought, nor was he required to for purposes of his Complaint, to identify every rule or understanding that creates a property right for procedural due process protection, though several were identified. *See* Complaint, ¶¶19-23. Mr. Jablonski's employment was terminated without notice by Defendant FBI Director. Jablonski Decl. at ¶¶6-7. The only reason given was that he allegedly "demonstrated unprofessional conduct". *Id.* at ¶7; Exhibit "1-A". Yet no details, much less due process opportunities for him to respond were ever provided. Jablonski Decl. at ¶10. Because he reasonably relied upon the due process protections created expressly by Defendant FBI to afford him an opportunity to defend himself from impermissible actions, *id.*, this Court should find that he possesses a constitutional property interest sufficient enough to deny the Defendants' Motion to Dismiss.

As DOJ's Inspector General has explained, "[t]he FBI has defined the actions that violate its standards of conduct, identified the range of discipline that it may impose when an employee commits misconduct, and developed a disciplinary process to address misconduct matters." DOJ OIG ROI at i; *see also* Complaint, ¶23 (citing ROI). One of the relevant documents identified by Mr. Jablonski is Defendant FBI's policy "Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process" ("Offense Codes"), *Id.* at ¶20. Mr. Jablonski, however, mistakenly identified an earlier version that was no longer in effect when he was terminated.

---

[6] As was discussed above, many federal employees maintain a property interest in their employment by virtue of the CSRA, but not so for the majority of FBI personnel, such as Mr. Jablonski. But that "do[es] not prevent the Bureau from giving its employees some security in their jobs." *Ashton*, 613 F.2d at 928. And that is exactly what Defendant FBI has done by adopting internal policies and procedures that effectively mirror the protections afforded by the CSRA. DOJ OIG ROI at 2. *See Mack v. United States*, 814 F.2d 120, 123 (2d Cir. 1987)("[I]t is true that even 'excepted service' public employees cannot be discharged for constitutionally impermissible reasons . . . .").

Instead, Defendant FBI adopted a new version in 2024, a copy of which is attached at Exhibit "3".

In the 2024 version, the Offenses Code discusses circumstances where the FBI Director may impose a harsher punishment than what was actually proposed:

> Additionally, the Director and the Deputy Director have the authority to review and amend any disciplinary decision issued by OPR or through the FBI's appellate process if deemed necessary to correct an injustice or to prevent harm to the FBI. This authority may be exercised in favor of or to the disadvantage of the employee in question and includes the authority to deviate from the FBI's Offense Codes and Penalty Guidelines or other applicable policies as needed. For example, the Director or Deputy Director may decide to impose a more severe penalty, including but not limited to, suspension, reassignment, demotion, or termination. This authority does not constitute an additional level of appeal for an employee, it will not be routinely exercised, and it remains the sole province of the Director or the Director's designee.

*Id*. at 2. To be clear, Mr. Jablonski does not dispute that there are procedural, internal FBI mechanisms that could permit an FBI Director to summarily terminate an employee, none of which were followed or relied upon in his situation, but those opportunities would occur *after* some level of due process steps transpire. The 2024 FBI's Offenses Code certainly suggests, if not states, that, and Mr. Jablonski has relied upon this interpretation. Whether the FBI Director increases a punishment to the termination level follows the issuance of a "disciplinary decision issued by OPR or through the FBI's appellate process". *Id*. That never happened in Mr. Jablonski's case as he was never afforded any opportunity to be provided due process.

Other guidance documents relied upon by Mr. Jablonski includes the Office of Professional Responsibility Policy Guide ("OPR Policy Guide") which establishes a multistep procedural mechanism for investigating and adjudicating misconduct claims. Complaint, ¶21. A copy of the Guide is attached at Exhibit "4". If an offense code violation is substantiated, a penalty is determined after considering the twelve factors identified in the leading MSPB case on imposing

disciplinary actions – *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981). OPR Policy Guide at *passim* (multiple citations to application of *Douglas* factors); Offense Codes at 3. This process "parallels the procedural protections outlined in the Civil Service Reform Act for more serious penalties." 2021 DOJ-OIG Report at 2. This highly reticulated disciplinary scheme provides "substantive provisions" that specify "particularized standards or criteria [to] guide … decisionmakers" seeking to remove an FBI employee. *Griffith v. F.L.R.A.*, 842 F.2d 487, 495 (D.C. Cir. 1988)(citation omitted). Significantly, those provisions do not authorize the FBI to dismiss employees for any reason. Rather, they authorize dismissal only for offenses identified in the Offense Codes. As a result, FBI employees have a legitimate expectation that dismissal for misconduct will rest on cause, not for no reason at all.[7]

Both the OPR Policy Guide and Offense Codes directly address summary dismissals and limit the authority of the FBI Director to four situations when such a decision would demand such "an extraordinary remedy," Offense Codes at 3: "When: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake". *Id.*; OPR Policy Guide at 8. Given the facts of this case, which must be relied upon as accept at this stage, it does not appear reasonable that Mr. Jablonski's termination for "unprofessional conduct", Exhibit "1-A", would neatly fit into one of those categories, if at all, especially since he had no advance warning, and no one could explain to him why this action had happened. Jablonski Decl. at ¶¶8-9. *See also e.g., Vanover v. Hantman*, 77 F.

[7] FBI personnel may be dismissed for other job-related reasons besides misconduct, including unacceptable performance, national security concerns, or inability to perform the essential duties and responsibilities of their position. But as with misconduct, the Bureau has adopted written policies that delineate permissible bases for such removals and establish the processes that must be followed, which employees such as Mr. Jablonski have come to rely upon. *See generally* Performance and Development Program Policy Guide (June 8, 2020), FBI Human Resources Division, attached at "5".

Supp. 2d 91, 102-03 (D.D.C. 1999)(protected property interest based, in part, on "elaborate disciplinary procedure" calling for "progressively stringent" discipline), *aff'd on other grounds*, 38 Fed. Appx. 4 (D.C. Cir. 2002); *Conley v. Bd. of Trs. of Grenada Cnty. Hosp.*, 707 F.2d 175, 180 (5th Cir. 1983)(property interest created by guidebook that lists thirty-six violations that may warrant dismissal). *See also Souther v. Patel et. al.,* Civil Case No. 25-150-SCJ (slip op., June 17, 2026, N.D.Ga.), attached at Exhibit "6" (FBI employee pled sufficiently to demonstrate property interest in employment in reliance of "existence of any past practices, employment handbooks, letters of appointment, or understandings from which an expectation of job tenure might arise." *Painter v. FBI*, 694 F.2d 255, 257 (11th Cir. 1982)). *Cf. Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)(Powell, J., concurring)("While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.").[8]

---

[8] Defendants' reliance on *Langeman*, while understandable, is misplaced. Defs' Memo at 1. There an FBI employee who had been summarily dismissed argued he had a "property right in his continued employment" because of a 1997 Memorandum by Former FBI Director Louis Freeh, which is not at issue in this case and is outdated. 88 F.4th at 294. While the Circuit did conclude that the memo "does not contain explicit mandatory language, but instead reserves 'expansive authority and discretion' for FBI leadership to determine the circumstances where an FBI employee may be summarily dismissed." *Id*. at 295 (*citing Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016)), Mr. Jablonski is not claiming that Defendant FBI lacks an ability to utilize summary dismissals under appropriate circumstances. But the internal governing rules and policies do not permit summary dismissal without some meaningful cause. Nor did the Circuit consider the other rules and policies raised by Mr. Jablonski to create a property right in receiving procedural due process before he can be terminated. As explained above, the relevant policies provide for summary dismissal only where "(a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake." Offense Codes at 3; OPR Policy Guide at 8. This language supplies sufficient "substantive limits" on official discretion to dismiss an employee to give rise to a property interest. *See Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997).

If anything, the above arguments should be deemed initially sufficient to support a premise that Defendant FBI's discipline policies create enough of a property right in procedural due process to merit discovery.[9]

**B. Mr. Jablonski Has Alleged Sufficient Facts To Support Proceeding To Discovery On His First Amendment Claim**

Mr. Jablonski agrees with the Defendants that claims of unlawful retaliation are analyzed under a four-part test, otherwise known as the *Pickering* test as a result of *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), "to determine if a public employee's termination violated his First Amendment rights." *LeFande v. District of Columbia*, 613 F.3d 1155, 1158 (D.C. Cir. 2010). Specifically:

> First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Id*. at 1158–59 (*quoting Wilburn v. Robinson,* 480 F.3d 1140, 1149 (D.C. Cir. 2007)). "The first two factors under the *Pickering* test are questions of law for the court to resolve." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994); *see also Connick v. Myers*, 461 U.S. 138, 147-48 & n.7 (1983)("Whether an employee's speech addresses a matter of public concern must be determined

---

[9] For example, discovery would seek, among other things, to: (1) identify all relevant and current documents describing the agency's dismissal policies, including guidance from supervisors and internal memoranda and e-mails; (2) determine what representations the FBI makes about job security in recruiting and retaining employees; and (3) explore whether the FBI has ever used, or purported to use, summary dismissal without finding misconduct or engaging into some sort of investigation or fact-finding efforts. These critical issues (and others) cannot be conclusively determined based on the pleadings alone. *See e.g., McCabe v. Barr*, 490 F. Supp. 3d 190, 221 (D.D.C. 2020)(ordering additional discovery on procedural due process claims). *See also Strzok v. Garland*, 2025 U.S. Dist. LEXIS 192975, *10 (D.D.C. Sept. 23, 2025)(discovery permitted; plaintiff received notice and opportunity to be heard before fate was decided).

by the content, form, and context of a given statement," and is a question of "law, not fact."). *See e.g., Elrod v. Burns*, 427 U.S. 347, 352 (1976)(plurality op.)(rejecting contention that recognizing First Amendment political-association claims by federal employees would interfere with "the executive's responsibility to ensure that the laws be faithfully executed" because "there can be no impairment of executive power . . . where actions pursuant to that power are impermissible under the Constitution").

Mr. Jablonski also acknowledges that his Complaint lacks significant factual details for at this stage he simply does not have any. He was informed that he was being placed on administrative leave because of online activity, i.e., the exercise of First Amendment speech. Complaint, ¶8. He was not provided any information beyond that. *Id*. He was then terminated. *Id*. at ¶¶9-10 for "unprofessional conduct". Presumably, whatever that might be refers to Mr. Jablonski's online activity. Only the Defendants possess the facts that would explain the circumstances, and they should not be rewarded by their failure to reveal them.

As argued above, the Court need not reach this argument if Defendant Director Patel's act to terminate Mr. Jablonski is deemed unlawful. Regardless, the Defendants should be required to first provide the factual justification for Mr. Jablonski's "unprofessional conduct", whether through discovery or as ordered by the Court, before this Count is dismissed.

Following receipt of that factual information, Mr. Jablonski can seek leave to file an Amended Complaint with the details and the Defendants could seek dismissal through summary judgment (or another Motion to Dismiss). Of course, the grant or denial of leave lies in the sound discretion of the District Court. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)(per curiam). The Court would, however, heed Rule 15's mandate that leave is to be freely given when justice so requires. *See Mouzon v. Radiancy, Inc.*, 309 F.R.D. 60, 64 (D.D.C. 2015).

Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 182 (1962).

### C. Mr. Jablonski's Derivative Claims Should Not Be Dismissed At This Time

Defendants seek dismissal of Mr. Jablonski's declaratory judgment and mandamus claims in Counts V and VI. Defs' Memo at 10. For the reasons set forth above, *see supra*, Mr. Jablonski has properly stated a sufficient claim to initially survive a Motion to Dismiss.

## CONCLUSION

For the reasons outlined above, this Court should respectfully grant Mr. Jablonski's Cross-Motion for Partial Summary Judgment and declare Defendant Director Patel's termination memorandum to have been unlawful thereby reinstating him to the position for which he was terminated retroactive to January 29, 2026 (with appropriate backpay and restoration of all other commiserate rights and privileges). That result would then allow for the Court to deny the Defendants' Motion to Dismiss without prejudice as moot. Alternatively, this Court should respectfully hold that it retains jurisdiction over Mr. Jablonski's claims and then still deny the Defendants' Motion.

Date: July 20, 2026

Respectfully submitted,

/s/ *Mark S. Zaid*

Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com

Attorneys for the Plaintiff